# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION



DAVE DIPAOLA, on behalf of himself and all
others similarly situated,

                         Plaintiffs,

               v.

UNIVERSAL ACCESS, INC., UNIVERSAL
ACCESS GLOBAL HOLDINGS, INC.,
PATRICK C. SHUTT, ROBERT M. BROWN,
ROBERT E. RAINONE, JR., GEORGE A. KING,
ROBERT J. POMMER, SCOTT D. FEHLAN, and
PAOLO GUIDI

                       Defendants.

**JUDGE HIBBLER**

**DOCKETED**

MAY 1 5 2002

No.

**02C 3470**

MAGISTRATE JUDGE NOLAN

*JURY TRIAL DEMANDED*

## CLASS ACTION COMPLAINT

### NATURE OF THE ACTION

    This is a securities class action on behalf of all purchasers of the common stock of Universal

Access, Inc. or Universal Access Global Holdings, Inc. (collectively "Universal Access" or the

"Company") between May 10, 2001 and April 24, 2002 (the "Class Period"), against Universal

Access and certain of its officers and directors seeking to pursue remedies under the Securities

Exchange Act of 1934 (the "Exchange Act").

    Plaintiff, individually and on behalf of all others similarly situated, by his undersigned

attorneys, makes the following allegations upon personal knowledge as to himself and upon

information and belief as to all other matters, including published reports and news articles as follows:

## JURISDICTION & VENUE

1.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. §240.10b-5].

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337 and §27 of the Exchange Act [15 U.S.C. §78aa].

3.      Venue is proper in this District pursuant to §27 of the Exchange Act, and 28 U.S.C. §1391(b). Universal Access maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

4.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

### *Plaintiff*

5.      DAVE DIPAOLA, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of Universal Access at artificially inflated prices during the Class Period and has been damaged thereby.

### *Defendants*

6.      Defendant Universal Access maintains its principal place of business at 233 South Wacker Drive, Suite 600, Chicago, Illinois, 60606.

7.      Patrick C. Shutt ("Shutt") was at all relevant times to this lawsuit the Chief Executive Officer and Chairman of Universal Access.

8.      Robert M. Brown("Brown") was at all relevant times to this lawsuit the Chief Financial Officer of Universal Access.

9.      Robert E. Rainone, Jr. ("Rainone") was at all relevant times to this lawsuit the President of Global Operations for Universal Access.

10.     George A. King ("King") was at all relevant times to this lawsuit the President of Client Services and Development for Universal Access.

11.     Robert J. Pommer ("Pommer") was at all relevant times to this lawsuit the Vice Chairman of Universal Access.

12.     Scott D. Fehlan ("Fehlan") was at all relevant times to this lawsuit the General Counsel and Secretary of Universal Access.

13.     Paolo Guidi ("Guidi") was at all times relevant times to this lawsuit a member of the board of Universal Access and Chief Executive Officer and Chairman of Aleron.

14.     Shutt, Brown, Rainone, King, Pommer, Fehlan, and Guidi are collectively referred to herein as the "Individual Defendants."

15.     The Individual Defendants, by reason of their management positions and responsibilities during the time period relevant to this Complaint, were "controlling persons" of Universal Access within the meaning of Section 20 of the Exchange Act. The Individual Defendants, because of their positions as officers and directors of Universal Access, had access to internal Company documents, reports and other information, including the adverse non-public information concerning the Company's financial position and business strategy, and attended management and/or board of directors meetings. As a result of the foregoing, they were responsible, individually and/or in concert, for the truthfulness and accuracy of the Company's public filings described herein.

16.     Universal Access, and the Individual Defendants as officers and directors of a publicly-held company, had a duty to promptly disseminate truthful and accurate information with respect to Universal Access and to promptly correct any public statements issued by or on behalf of the Company which had become false or misleading.

17.     Each of the defendants knew, individually and/or in concert, or recklessly disregarded that the false and/or misleading statements and omissions complained of herein would adversely affect the integrity of the market for the Company's stock and would cause the price of the Company's common stock to become artificially inflated. Each of the defendants acted knowingly or in such a reckless manner as to constitute a fraud and deceit upon plaintiff and the other members of the Class.

18.     Defendants are liable, jointly and severally, for the wrongs complained of herein.

### CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who purchased Universal Access common stock during the Class Period (the "Class"). Excluded are the defendants, any entity in which the defendants have a controlling interest or is a parent or subsidiary of or is controlled by the Company, and the defendants' officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns.

20.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff reasonably believes that there are hundreds, if not thousands of members of the Class located throughout the United States. The

Company had approximately 100 million shares of its common stock outstanding as of the end of the Class Period.

21.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.   Among the questions of law and fact common to the Class are:

      (a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

      (b)     whether the Company issued false and misleading financial statements during the Class Period;

      (c)     whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

      (d)     whether the market prices of the Company's securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

      (e)     whether the members of the Class have sustained damage and, if so, what is the appropriate measure of damages.

22.     Plaintiff's claims are typical of the claims of the members of the Class because plaintiff and the other members of the Class each sustained damages arising out of the defendants' wrongful conduct in violation of the federal securities laws as alleged herein.

23. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

24. A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them. Plaintiff anticipates no unusual difficulties in the management of this action as a class action.

## APPLICABILITY OF FRAUD ON THE MARKET
## DOCTRINE AND THE PRESUMPTION OF RELIANCE

25. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

    (a)    defendants made public misrepresentations or failed to disclose material facts during the Class Period;

    (b)    the omissions and misrepresentations were material;

    (c)    the securities of the Company traded in an open and efficient market;

    (d)    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

    (e)    plaintiff and the other members of the Class purchased Universal Access stock between the time the defendants failed to disclose or misrepresented material

facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

26.     Based upon the foregoing, plaintiff and the other members of the Class are entitled to the presumption of reliance upon the integrity of the market.

## NO STATUTORY SAFE HARBOR

27.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint because none of the statements pleaded herein are "forward-looking" statements, nor were they identified as "forward-looking statements" when made. Nor did meaningful cautionary statements identifying important factors that could cause actual results to differ accompany those statement. To the extent that the statutory safe harbor does apply to any statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those statements was made, the speaker actually knew those forward-looking statement were false and/or the statement was authorized and/or approved by an executive officer of Universal Access who actually knew that the statements were false when made.

## SUBSTANTIVE ALLEGATIONS

### A. Universal Access

28.     Universal Access was founded in 1997 by Defendants Shutt and Pommer when demand for communications services was growing rapidly due in large part to the expansion of the Internet and data communications networks. This new demand was met by the formation of hundreds of communications companies intending to capitalize on the growing market. Additionally, existing companies set out to raise substantial capital in an effort to expand their current operations.

-7-

However, due to infrastructure limitations, no communications service provider can work completely independently of its competition. Service providers often purchase service from many of its competitors networks in order to provide its customer with service. This process, called "off-net" provisioning in the industry, became the foundation of Universal Access's business.

29. In order to assist communications service providers with their "off-net" provisioning, Universal Access would negotiate volume discounts with various communications service providers in order to resell their services to other communication service providers, acting as a middle-man of sorts. Universal Access would purchase and augment a database which contained information about the location and intersection points of various networks and then utilize a team of communications provisioning personnel to most efficiently provide end-to-end circuits for its customers using the bandwith it had acquired along with the database.

30. Universal Access purchased as much bandwith as it could at bulk discount rates and then resold it to other providers at a profit. However, the rapid growth of communications service providers and the accompanying infrastructure led to the end of the market inefficiencies that Universal Access relief upon. In fact, by the end of 2000, there was a glut in communications networks and bandwith and demand had decreased seemingly as rapidly as supply increased. As the demand for its reseller services declined, so did Universal Access' ability to hit revenue and profit targets. The Company and the Individual Defendants needed a way to keep Universal Access' revenues up and thus devised a new business plan. However, the Company's shareholders were not made fully aware of how the new plan worked. This risky new business plan was called CORE.

**B. Universal Access' New Business Strategy**

31.     During the first quarter of 2001, the Individual Defendants enacted Universal Access'

new business strategy converting Universal Access into the largest "factoring" firm in the U.S. In

other words, if a service provider had $5 million per month in circuit costs from their supplier,  it

would include hundreds if not thousands of connections which would have various expiration dates.

Universal Access would come in and assume the liability for the costs of these circuits and, in theory,

as the contracts on each of the circuits expired, Universal Access would then replace them with

circuits from other providers at lower rates and share a percentage of the savings with the customer.

The customer would have the same costs for approximately the first year, and Universal Access

would count the customers circuit costs as revenue as Universal Access was now payed rather than

the actual supplier.  While the reality was that Universal Access had no revenue from this business

structure, the Company appeared to have revenue growth due to the manner in which the information

was presented to investors.

32.     The CORE strategy was fraught with risk though.  If a customer filed bankruptcy or

ceased operations for any reason, Universal Access was obligated to pay the remainder of the

contracts for which it has assumed liability.  For this reason, the Company concealed CORE and its

attendant risks from the public.  The Individual Defendants concealed this information knowing that,

due to the volatile communications market, a substantial risk existed that their customers would

become insolvent and Universal Access would be left to pay off potentially millions of dollars in

contracts.

33.     No Class Member would have invested in Universal Access had they known the truth

about how Universal Access was meeting its revenue projections, therefore explaining why the

Individual Defendants began to release false and misleading statements to the investing public to conceal these facts.

34.     Universal Access first announced the "success" of the CORE initiative to investors in a May 10, 2001 press release:

**Universal Access Reiterates Guidance Based on Success of CORE Initiative**

CORE Strategy Providing Inroads to Top U.S. Telecom Providers

**CHICAGO, May 10, 2001** - Universal Access Inc. (Nasdaq: UAXS), a leading provider of network infrastructure services, today reiterated its forecast for the second quarter ending June 30, 2001 and reaffirmed it revenue forecast for the year, profitability and cash flow targets. The company attributes this confidence to the success of its CORE initiative launched earlier this year.

"CORE continues to gain momentum with the company's top 25 accounts, and the fundamentals of the business continue to grow stronger," said Universal Access Chairman and CEO Patrick Shutt. "However, with the broad pressure on stock, especially in the telecom industry, we do not believe the current market prices accurately reflect the long term value of our shares."

The press release continued with following highlights and financial projections:

**Shutt highlighted the achievements of CORE include:**

- A 38% increase in revenue from the company's top 25 customer since CORE's launch in January
- New circuit sales for the first four months of 2001 were $3 million of monthly recurring revenue
- "What we are seeing is a growing recognition of what we can do for service providers and carriers," said Shutt. "The early results of CORE are proving what we have known all along. Telecom companies are spending significantly less on network infrastructure, while at the same time business and consumer demand has continued to increase. Universal Access is the go-to solution to deliver 'off-net' capacity to help our clients meet the needs of their customers."

-10-

**CORE Fosters Customer Alignment**

The CORE initiative relies on closer alignment with customer to maximize the company's ability to provide a single, end-to-end source for all provisioning services. Under CORE, the company is targeting four types of opportunities that allow it to better penetrate each account:

- New Business – Expanding existing networks, building out new network capacity or connecting new customers. This type of revenue has accounted for most of Universal Access' growth prior to CORE.
- Backlog of circuits – Addressing backlogged circuits that are not generating revenue to help customers improve customer satisfaction, realize revenue faster, decrease operational expense and extend network reach without huge capital outlays.
- Transfer of existing circuits – Similar to assignment, but customer circuits in this category are out-of-term and can be acquired without a long negotiation process with the incumbent carrier, making it easy for the customer to make a quick decision. In addition, these circuits can potentially be re-groomed through Universal Access' UTX facilities to increase circuit margin.
- Maintaining Strong Balance Sheet

"Our confidence in our forecast is also bolstered by the continuing strength of our balance sheet," said CFO Bob Brown. At the end of April, the company's balance of cash, restricted cash and short term investments increased to $87.9 million from $84.1 million at March 31. Strong collections activity reduced accounts receivable to $13.2 million at April 30 from $17.1 million at March 31, and $1 million was invested in capital expenditures in the month.

The company continues to project second quarter sequential revenue growth of 26% to 28% and expects to finish the year with revenues in a range of $155 to $160 million. Expectations for capital expenditures for the year are $32 to $34 million. SG&A expenses, which reached $21.5 million for the first quarter, is expected to increase only nominally through the rest of the year. Employee count at April 30 was 434 compared to 443 at March 31 and is expected to remain relatively flat for the remainder of the year. The company continues to expect to reach operating cash flow break even in Q1 2002 and to achieve positive EBITDA and operating cash flow in Q2 of 2002.

35.     These statements were materially false and misleading.  Defendant Shutt comments that due to the success of the CORE initiative "the fundamentals of the business continue to grow stronger."  Shutt knew that the opposite was true and instead of accurately describing the new business strategy and disclosing its inherent risks, Shutt provided false and misleading information leading investors to believe that Universal Access was on track and meeting financial projections. Shutt knowingly used the misleading CORE initiative numbers to mislead the public about the actual financial state of Universal Access.  Further, Defendant Brown reaffirmed Universal Access' revenue forecast for the year, as well as profitability, and cash flow targets.  Brown knowingly misled the investing public by emphasizing the continuing strength of Universal Access's balance sheet when the Company had gone out and hired an investment bank to raise additional capital despite the fact that the press release states "there are no current plans for any offerings under the shelf registration statement filed with the Securities and Exchange Commission on April 27, 2001."

36.     Additionally, Defendant Brown knowingly misled the investing public by indicating success in collecting outstanding accounts receivables when Universal Access was actually experiencing an increasing amount of delinquent and terminated contracts.  In fact, over sixty-five (65) customers canceled service and terminated their contracts with Universal Access in the last three quarters of 2001.  By the time of the May 2001 press release, it was obvious to the Individual Defendants that there was an increase in such cancellations as more and more telecom companies were folding and filing for bankruptcy, but this information was not shared with investors.

## C.  The Decline of Universal Access

37.     By May of 2001, the Individual Defendants were aware of Universal Access' increasing problems as it was losing in excess of $15 million per quarter.  As described above,

Universal Access was also experiencing practically zero growth in revenue, and was losing customers at an alarming rate. It was clear to the Individual Defendants that Universal Access would run out of money in 2002. In an effort to prevent this, the Individual Defendants began attempts to reduce the Company's operating expenses and raise additional cash. These measures included: (1) reducing by more than 10% Universal Access' workforce; (2) attempting to return over $20 million in hardware to Nortel Networks, Inc.; and (3) retaining real estate broker Cushman & Wakefield to sub-lease a portion of its corporate office lease in downtown Chicago.

38.     In addition, Universal Access retained investment bank Chase H&Q to advise on raising additional capital. On April 27, 2001, Universal Access filed an SEC S-3 registration statement in anticipation of a public offering. When the investing public became aware of this filing, questions regarding the company's stability surfaced and Universal Access stock declined by approximately 38%.

39.     The May 10, 2001 press release was a reaction to the decline in Universal Access' stock price. However, rather than explaining the true financial state of the Company the Individual Defendants misled the public to believe that all was well with Universal Access.

### D.  Further Misleading Press Releases

40.     Universal Access continued to mislead investors with an August 30, 2001 press release as follows:

**UAXS Global Holdings Confirms Profitability Through Corporate Consolidation, $9.6M Customer Contract**

Secured $30M Equity Commitment Letter for Potential Opportunities

**Chicago - Aug. 30, 2001** - UAXS Global Holdings Inc. (NASDAQ: UAXS) announced today the company expects to become EBITDA

positive in January 2002, free cash flow positive in Q1 of 2002 and net income positive in Q2 of 2002 due to continued growth in monthly recurring revenue (MRR) and significant reductions in SG&A expenses. While Q3-ending MRR is expected to be 11% above Q2 ending MRR, higher-than-expected disconnections early in the quarter are expected to result in flat quarter-over-quarter revenue growth. The company also has secured its first CORE transfer contract equaling $9.6 million of annualized revenue, as well as additional potential funding for strategic opportunities.

***

**New Quarterly Guidance**

UAXS Global Holdings expects to finish the quarter with approximately $11.1 million in MRR, an increase of approximately 11% over the second quarter. Although the company continues to experience strong penetration of its customers, it also experienced higher-than-expected disconnects at the beginning of the quarter. Due to these higher disconnections plus revenue increases coming toward the end of the quarter, Q3 revenues are expected to be even with Q2.

UAXS Global Holdings expects to finish the fourth quarter of this year with an MRR of $12.5 million at a gross margin of approximately 32%. UAXS Global Holdings remains fully funded to profitability.

"We entered this year with an expectation that we would achieve $155 to $160 million in revenue and scaled the company to foster and accommodate that level of growth. However, with the market downturn in telecommunications, which is causing a higher level of disconnections, we have scaled down our revenue estimate but still expect to finish 2001 with year-over-year growth of 135%," said Shutt. "Based on our continued confidence in Universal Access's future, a number of company executives, board members and I expect to increase our stake in the company' future through buying shares in the open market."

**Another Major CORE Win**

Universal Access also recently secured another CORE transfer contract worth approximately $9.6 million with a national ISP, of which $720,000 is expected to be in Equal Access revenues. The client also expects to

-14-

purchase cabinet space in more than eight sites. The contract is expected to bring in an estimated $800,000 of MRR for Universal Access beginning in September.

***

**Obtained Additional Funding for Strategic Opportunities**

Also today, ComVentures, a prominent California-based venture capital firm and long-time equity partner in UAXS Global Holdings, has indicated that it is prepared to invest up to $30 million in the company, which could be used for potential strategic opportunities. Any potential investment will be subject to conditions including board approval and definitive agreements. UAXS Global Holdings is under no obligation to utilize any of these potential funds and has no immediate plans to use these funds.

"Today's restructuring and reduction in headcount, as well as our recent ISP win, will enable the company to become cash flow positive in Q1 of 2002 and net income positive in Q2 of 2002," stated Bob Brown, CFO, UAXS Global Holdings. "We remain strong even in today's tumultuous telecom marketplace."

41. Universal Access announced in this press release that the Company had obtained $30 million in new funding, while just months earlier in the May, 2001 press release detailed above, Defendant Brown stated that Universal Access had no plans to raise additional capital. In addition, Brown stated that the additional capital was for strategic acquisitions, while the reality was that Universal Access was rapidly losing money and was in danger of running out of funds.

42. Furthermore, the press release placed great emphasis on Monthly Recurring Revenue ("MRR"), and in fact, many of the analysts who covered Universal Access praised the Company's MMR. Not surprisingly, MMR was the essence of CORE and therefore such numbers presented to the public would have a great effect on the Market. This press release even lauded a deal resulting in $9.6 million in MMR when in reality Universal Access had simply taken responsibility for paying a customer's bills.

-15-

43.     The false and misleading statements continued as Universal Access issued another

press release on October 30, 2001 regarding deals that the Individual Defendants knew were not

beneficial to the Company and were with businesses headed for financial disaster of their own.  The

press release stated as follows:

**Universal Access Announces Third Quarter Results Highlighting
Strong Growth in Recurring Revenues and Reaffirming Positive
EBITDA in the First Quarter of 2002**

**CHICAGO, IL, October 30, 2001** – Universal Access Global Holdings
Inc. (Nasdaq: UAXS) today announced results for the quarter and nine
months ended September 30, 2001.

**Third Quarter 2001 Financial Highlights**

-     Revenues were $30.7 million, 119% above the third quarter a year
      ago
-     Monthly Recurring Revenues (MRR) grew 11% to $11.1 million
      with a 32.5% gross margin
-     Won a major CORE account transfer with WAMINET generating
      over $1 million of MRR
-     Reduced SG&A 19% from Q2 and exited Q3 with an operating
      cash burn rate of less than $700,000 per month
-     Ended the quarter with $55.1 million in cash

"The many positive factors that contributed to the quarter's results further
proved the validity of our model and bolster our confidence in achieving
profitability early next year," said Patrick Shutt, Chairman and CEO of
Universal Access.  "Despite a difficult industry environment which has
challenged many of our customers and vendors, and generated higher
disconnect levels early in the quarter, we were able to significantly
increase revenues from our major customers.  In September, we closed a
major CORE transfer with WAMINET, which represents our fourth
million dollar per month customer.  At the same time, our team generated
strong increases in MRR from many of our top customers, including
MCI/Worldcom/UUNET, Cable & Wireless, AT&T, Level 3,
BCE/Teleglobe, Broadwing, Microsoft and Touch America.  We also
successfully restructured our costs to reduce our SG&A and cash burn
rates."

**Third Quarter Financial Results**

For the third quarter ended September 30, 2001, total revenues increased to $30.7 million, a 119% increase versus $14.0 million from the comparable period in 2000. Gross profit for the third quarter expanded to $10.0 million, up 170% from $3.7 million in the third quarter of 2000. Gross margin increased 620 basis points (BPS) to 32.5% frm 26.3% in the prior year period. The net loss for the third quarter was $64.5 million or ($0.70) per share. Before restructuring and other one-time charges and non-cash stock option compensation charges, the net loss for the quarter was $12.1 million or ($0.13) per share.

***

**Outlook**

"The third quarter's results solidified our ability to meet our objectives of achieving positive EBITDA in January 2002, positive free cash flow in the first quarter of 2002 and positive EPS in the second quarter of 2002," said CFO Bob Brown. "Continued revenue growth from CORE customers and a lower, more normalized rate of disconnections as we experienced in September and thus far in October, keep us on-track to achieve year-over-year revenue growth of 135%."

**Other Highlights**

-       Customer Wins - In addition to increased MRR from most existing CORE customers, the company also achieved several large customer wins in the quarter. In support of new initiatives, Microsoft significantly expanded its relationship with Universal Access, the company achieved a major CORE transfer with WAMINET and received a transfer of PathNet circuits following its bankruptcy filing.

44.       Despite actual awareness that Worldcom, Level 3 and other customers such as MFN and GX were heading for bankruptcy or restructuring, Defendants Shutt and Brown continued to make positive announcements based on revenue with these companies without disclosing the risks that they posed for Universal Access. They also continued to record the entire amount of CORE transfers as revenue even though it is merely pass-through money.

### E. The Aleron Deal

45.     On November 12, 2001, Universal Access announced a deal with IP provider Aleron which the Company stated would be worth $11.4 million in first-year revenue. Under the terms of the deal announced to the public, Aleron would pay Universal Access approximately $1.15 million per month for the use of Universal Access' networks. These were essentially the same payments that Aleron was making before the deal, only now the money passed through Universal Access enabling the Company to book it as revenue.

46.     However, Aleron was experiencing its own financial difficulties and this deal was entered into by the Individual Defendants despite the fact that they were aware that Aleron could not make the required monthly payments.

47.     In addition, the Company and the Individual Defendants failed to disclose that the CEO of Aleron, Defendant Paolo Guidi, was also serving on the Board of Directors of Universal Access.

48.     In addition, Universal Access also agreed to purchase asynchronous transfer mode ("ATM") equipment from Aleron for $3 million contingent on Aleron's ability to raise additional funds to pay for the network services provided by Universal Access. Therefore, whether or not Aleron could make the necessary payments for the network services, Universal Access would be able to book revenues and have a better chance of reaching it financial forecasts.

49.     Even though the network services contract and ATM equipment transfer was in reality a ploy to boost Universal Access' alleged revenue, the Company still lauded the deal in its November 12, 2001 press release as a "strategic move" that would help Universal Access.

**Universal Access Chosen by Aleron as its Outsourced Network
Service Provider - $11.4M First Year Revenue**

**Universal Acquires ATM Network - Extending Company's Vision to
Wholesale Customers**

**CHICAGO - November 12, 2001 -** In a *strategic move*, Aleron, an
industry leader in high-performance Internet connectivity, data
transmission and value-added network applications, chose Universal
Access (NASDAQ: UAXS) as its outsourced network services provider.
Universal Access, which specializes in connectivity services for clients
worldwide, will provide procurement, provisioning and network
management services for off-net circuits carrying data and value-added
services to Aleron's customers throughout the United States.

In addition, Universal Access will support Aleron's need for ATM
connectivity through the purchase of its ATM network. "ATM is a natural
progression for Universal Access. As we strive to meet the needs of our
wholesale customers, extending our offering to include ATM services is
becoming critical. The Aleron network mirrors out deployment enabling
or allowing Universal Access to easily integrate the new ATM switching
network into existing network facilities,: stated Patrick Shutt, CEO,
Universal Access.

***

"Our ATM services for the wholesale market will focus on
implementation of higher-speed backbone services for ISPs, aggregation
of DSL, RBOC service interconnection and services required by next
generation ATM-based integrated services providers," said Shutt.

"ATM continues to show strong revenue growth, driven by ISP and large
business customers. ATM's growth is closely linked to the growth of IP,
as ATM is often the underlying infrastructure for IT backbones" Ron
Kaplan, senior research analyst, IDC.

***

This is another example of the traction gained through the Universal
Access Core/Transfer service offering. Through this transfer, Universal
Access offers Aleron:

Improved efficiency, elimination of multi-vendor management,

streamlined billing, one-call resolution of network issues and lower costs;
Continued delivery of end-to-end circuit provisioning services for new
orders to deliver faster speed to revenue, elimination of provisioning
headaches, single-source delivery and extended network reach without
capital expenditures.

50.     Although Defendant Shutt stated that CORE was "improving efficiency" and

"eliminating multi-vendor management," it was never explained that all the business and financial risks

of the underlying contract had been transferred to Universal Access.

51.     The Aleron deal succeeded as far as the Individual Defendants were concerned.  On

November 9, 2001, Universal Access's stock had closed at $2.61 and within days of November 12,

2001 announcement of the Aleron deal, the stock was trading at $4.34.

52.     The false and misleading statements continued as Universal Access issued a press

release on January 9, 2002 touting the Company's performance.

**Universal Access O4 Revenue Exceeded $35 Million: Achieved
Positive EBITDA for December**

CHICAGO, Jan. 9 /PRNewswire/ – Universal Access Global Holdings
Inc. (Nasdaq: UAXS - news) today announced that revenues for its fourth
quarter ended December 31, 2001 exceeded $35 million, above the
company's previous guidance of $33 million.  Based on these higher
revenues, the company also generated positive EBITDA (excluding non-
cash compensation charges) for the month of December, a month earlier
than projected.  For the full year 2001, the company's revenues exceeded
its $120 million forecast, which represented a 135% increase over 2000.

"We are very excited to announce that Universal Access achieved positive
EBITDA for December, a full month ahead of schedule," said Patrick
Shutt, Chairman and CEO of Universal Access.  This company
benchmark reflects successful execution in all facets of the company's
operations as we continue to deploy our model.  It is the recognition of our
benefits of outsourcing, speed to revenue, SG&A cost containment and
ability to reduce network costs that is generating traction which carriers still
working through a difficult telecom market.

53.     Universal Access issued these statements despite the fact that Aleron was unable to pay for any services, and it was clear to the Individual Defendants that Aleron had still not found any additional funding.  The Aleron deal allowed Universal Access to claim positive Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") a month earlier than projected.

54.     Universal Access's problems with its business plan and its customers continued into 2002, but Universal Access continued to conceal the news from investors.   Universal Access customer GX filed Chapter 11 on January 28, 2002 while no announcement was made to investors about this major customers financial woes.  In addition, at the end of 2001 customer MFN had less than $37 million in cash with an interest payment in excess of $30 million due on March 15, 2002.

55.     Despite all of the mounting problems of Universal Access and its various customers the Individual Defendants would "Reiterate 2002 Guidance" with the following February 22, 2002 press release:

**Universal Access Reiterates 2002 Guidance**

CHICAGO, Feb. 22/PRNewswire-FirstCall/ – Universal Access (Nasdaq: UAXS - news) today reiterated its revenue and profitability guidance for this year.

"Despite challenging industry conditions, our sales pipeline continues to be very strong, in excess of $25 million of monthly recurring revenues (MRR)," said Patrick Shutt, Chairman and CEO.  "As a result, we remain confident in our 2002 guidance: MRR to grow to $19 to $20 million at year end; to generate positive EBITDA for the first quarter of this year; to achieve positive operating cash flow in the first quarter; and to achieve positive EPS at a point in the second quarter.  While delayed from what we had expected, the large customer announcement we referred to on our call is also still pending."

"We are reiterating our guidance for 2002, and we remain fully funded to free cash flow and profitability," added CFO Bob Brown.  "The industry's difficulty in growing revenues and reducing costs remains a significant

opportunity driver for us, as we represent an easy and no-cost answer to both of those problems."

56. Despite actual knowledge that several of its customers could not pay, the Individual Defendants continued to make materially false and misleading announcements to investors artificially inflating the price of Universal Access stock.

### F. William Communications and Capacity Swapping

57. The SEC recently began an investigation into various "capacity swapping" transactions conducted by Williams Communications ("Williams"), many of which involved Universal Access.

### G. The March Press Release on Aleron

58. On March 22, 2002, just one month after reiterating its revenue and profitability targets, Universal Access issued a press release withdrawing that revenue guidance as well as revising its profitability target for 2002. The stated reason for the press release was the recent bankruptcy filing by Aleron. However, the Individual Defendants had known for months that Aleron was going to file bankruptcy, and in fact, they had been planning for it through transfers of assets, such as Aleron's ATM network, to Universal Access to keep them out of Aleron's bankruptcy filing.

59. The March 22 press release stated as follows:

**Universal Access Revised 2002 Guidance**

CHICAGO, March 22 /PRNEWSWIRE-FirstCall/ – With Aleron's recent filing for bankruptcy, the possibility of an additional filing by one other customer and recently prolonged customer closing cycles, Universal Access (Nasdaq: UAXS - news) today felt it prudent to withdraw revenue guidance as well as revise its profitability target for 2002. The company now anticipates re-establishing positive EBITDA in the second half of 2002 but believes it is premature to provide further guidance for the year. The company emphasized that it has a sound cash position and minimal debt.

-22-

Aleron's bankruptcy is expected to reduce the company's first quarter 2002 reported revenues by approximately $4.8 million, and actions that may be taken by one other customer that has recently threatened bankruptcy could reduce revenues by another $1.1 million per month. Universal Access believes that other than these two customers, *the remaining base of its top 25 customers is diversified and stable.* Executives note that the top 25 accounts include many large service providers such as Microsoft, and large national and international carriers such as AT&T and BCE. However, given the environment and recent customer filings and statements, the company will also further increase bad debt reserves to a level it believes is adequate in light of the further deterioration of credit in the sector.

The telecom industry has been shaken by a number of restructurings, bankruptcies and overall financial distress. This environment has prolonged sales closing cycles from historical norms, also affecting new revenues that were expected for the quarter. However, the industry's difficulty in growing revenues and reducing costs should ultimately provide a significant opportunity for Universal Access' primary business of off-net connectivity as well as the recently announced outsourcing services.

Universal Access will continue to optimize its cost control measures throughout the company to enhance bottom line results. Management has stated that the company's cash position is sound, it has limited debt, remains fully funded to anticipated profitability and expects to re-establish positive EBITDA in the second half of 2002.

60.     While some of the truth began to emerge in March, the Individual Defendants continued to intentionally misrepresent Universal Access's financial condition. In an effort to keep the stock price artificially inflated following the March, 2002 press release the Individual Defendants improperly recognizing revenue from a contract with TeleGlobe which Universal Access had not yet actually secured.

## H. TeleGlobe and 2001 Revenue

61.     During the third and fourth quarters of 2001, Defendant Shutt repeatedly reported to analysts and others that Universal Access was on the verge of landing a large contract. While

Universal Access did enter into a contract with TeleGlobe in 2001, it was for only a fraction of the revenues that Shutt had boasted about to analysts and investors. Faced with missing revenue projections Defendant Shutt insisted that the entire amount of the contract be recognized as revenue in 2001. This fraudulent bookkeeping allowed Universal Access to meet its 2001 revenue projections.

62.　Unfortunately, the investing public was unaware that Universal Access met its 2001 revenue projections by fraudulently recognizing and misrepresenting revenue from a contract that never even met the expectations touted by the Company's officers.

### COUNT I

### (VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 BROUGHT AGAINST ALL DEFENDANTS)

63.　Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

64.　During the Class Period, defendants directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which the defendants knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon plaintiff and the other members of the Class. Defendants made various deceptive and untrue statements of material facts, and omitted material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading to plaintiff and the other members of the Class. The purpose and effect of the scheme, plan, and unlawful course of conduct was, among other things, to deceive the investing public, including plaintiff and the other members of the Class,

and to induce plaintiff and the other members of the Class to purchase Universal Access common stock during the Class Period at artificially inflated prices.

65.    During the Class Period, the defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly and/or recklessly issued, caused to be issued, participated in the issuance of, the preparation and/or issuance of deceptive and materially false and misleading statements to the investing public as particularized above.

66.    As a result of the defendants' dissemination of and/or failure to correct the false and misleading statements set forth above, the market price of Universal Access common stock was artificially inflated during the Class Period. Unaware of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by the defendants, plaintiff and the other members of the Class relied, to their detriment, on the integrity of the market price of the stock in purchasing Universal Access common stock. Had plaintiff and the other members of the Class known the truth, they would not have purchased Universal Access shares or would not have purchased them at the inflated prices that they did.

67.    Plaintiff and the other members of the Class have suffered damages as a result of the wrongs herein alleged in an amount to be proved at trial.

68.    By reason the foregoing, the defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to plaintiff and the other members of the Class for damages which they suffered in connection with their purchases of Universal Access stock during the Class Period.

## COUNT II

### (VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT BROUGHT AGAINST THE INDIVIDUAL DEFENDANTS)

69.     Plaintiff repeats and realleges each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

70.     The Individual Defendants acted as controlling persons of the Company within the meaning of section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and active participation in and/or awareness of the Company's day-to-day operations, and/or intimate knowledge of the Company's expansion plans and implementation thereof, each Individual Defendant had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiff alleges are false and misleading. The Individual Defendants were provided with, or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged herein to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

71.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

72.     By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act. As a direct and proximate result of the wrongful

conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on her behalf and on behalf of the Class, respectfully requests that this Court:

A. Declare this action to be a proper class action and certify plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B. Award monetary damages against all of the defendants, jointly and severally, in favor of plaintiff and the other members of the Class for all losses and damages suffered as a result of the wrongdoings alleged herein, including punitive damages where appropriate, together with interest thereon;

C. Award plaintiff the fees and expenses incurred in this action, including reasonable allowance of fees for plaintiff's attorneys and experts; and

D. Grant plaintiff and the other members of the Class such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:  May 14, 2002

Respectfully submitted,

DAVE DIPAOLA, on behalf of himself and all others similarly situated,

By: _____

Marvin A. Miller

Matthew E. Van Tine
**MILLER FAUCHER AND CAFFERTY LLP**
30 North La Salle Street, Suite 3200
Chicago, Illinois 60602
Telephone: (312) 782-4880
Fax: (312) 782-4485

Marc A. Topaz
Darren J. Check
**SCHIFFRIN & BARROWAY, LLP**
Three Bala Plaza East
Suite 400
Bala Cynwyd, Pennsylvania 19004
(610) 667-7786

Paul J. Geller
**CAULEY GELLER**
**BOWMAN & COATES, LLP**
One Boca Place
2266 Glades Road, Suite 421A
Boca Raton, Florida 33431
(561) 750-3000

Nadeem Faruqi
**FARUQI & FARUQI LLP**
320 East 39th Street
New York, NY 10016
(212) 983-9330

***Attorneys for Plaintiffs***

-28-

## CERTIFICATION OF NAMED PLAINTIF
### PURSUANT TO FEDERAL SECURITIES LAWS

I, Dave Dipaola, declare, as to the claims asserted under the federal securities laws, that:

1.   Plaintiff has reviewed the Complaint and retains Schiffrin & Barroway, LLP and such co-counsel it deems appropriate to associate with to pursue such action on a contingent fee basis.

2.   Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.   Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.   Plaintiff's transaction in the Universal Access Global Holdings, Inc. (Nasdaq: UAXS) security that is the subject of this action during the Class Period are as follows:

| No. of Shares | Buy/Sell | Date | Price Per Share |
|---|---|---|---|
| 1500 | Buy | 6/26/01 | 4.45 |
| 2000 | Sold | 7/09/01 | 4.34 |
| 2250 | Sold | 7/09/01 | 4.34 |

[1]List additional transactions on a separate sheet of paper, if necessary.

5.   During the three years prior to the date of this Certification, Plaintiff has sought to serve or served as a representative party for a class in the following actions filed under the federal securities laws:

N/A

6.   Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _14_ day of _MAY_, 2002.

_Dave DiPaola_
**DAVE DIPAOLA**

Dipaola/CRT

Civil Cover Sheet

Page 1 of 2

DOCKETED
MAY 1 5 2002

UNITED STATES DISTRICT COURT **JUDGE HIBBLER**
NORTHERN DISTRICT OF ILLINOIS

# Civil Cover Sheet MAGISTRATE JUDGE NOLAN

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use **only** in the Northern District of Illinois.

**Plaintiff(s): DAVE DIPAOLA,**

County of Residence: Nassau County

Plaintiff's Atty: Miller Faucher and Cafferty LLP
30 North LaSalle Street, Suite 3200
Chicago, Illinois 60602
(312) 782-4880

**Defendant(s):UNIVERSAL ACCESS, INC. et al.**

County of Residence: Cook

Defendant's Atty:

# 02C 3470

II. Basis of Jurisdiction:     **3. Federal Question (U.S. not a party)**

III. Citizenship of Principal
Parties **(Diversity Cases Only)**
                    Plaintiff:- **N/A**
                    Defendant:- **N/A**

IV. Origin :        **1. Original Proceeding**

V. Nature of Suit:     **850 Securities / Commodities / Exchange**

VI.Cause of Action:     **15 U.S.C. §§ 78j(b) and 78t(a)**

VII. Requested in Complaint
            Class Action: **Yes**
            Dollar Demand:
            Jury Demand: **Yes**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

Signature: _____

Date: ___5/14/02___

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it.
Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### Eastern Division

DOCKETED

MAY 1 5 2002

JUDGE HIBBLER
MAGISTRATE JUDGE NOLAN

In the Matter of

DAVE DiPAOLA,

v.

UNIVERSAL ACCESS, INC., et al.

Case Number: 02C 3470

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Dave DiPaola, individually and on behalf of all others similarly situated,

| (A) | (B) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME Marc A. Topaz | NAME Marvin A. Miller |
| FIRM Schiffrin & Barroway, LLP | FIRM Miller Faucher and Cafferty LLP |
| STREET ADDRESS Three Bala Plaza East, Suite 400 | STREET ADDRESS 30 North LaSalle Street, Suite 3200 |
| CITY/STATE/ZIP Bala Cynwyd, Pennsylvania 19004 | CITY/STATE/ZIP Chicago, Illinois 60602 |
| TELEPHONE NUMBER (610) 667-7786 | TELEPHONE NUMBER (312) 782-4880 |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 01916769 |
| MEMBER OF TRIAL BAR? YES ☐ NO ☑ | MEMBER OF TRIAL BAR? YES ☑ NO ☐ |
| TRIAL ATTORNEY? YES ☑ NO ☐ | TRIAL ATTORNEY? YES ☑ NO ☐ |
| | DESIGNATED AS LOCAL COUNSEL? YES ☑ NO ☐ |

| (C) | (D) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME Darren J. Check | NAME |
| FIRM Same as (A) | FIRM Same as (B) |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER | TELEPHONE NUMBER |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR? YES ☐ NO ☑ | MEMBER OF TRIAL BAR? YES ☐ NO ☐ |
| TRIAL ATTORNEY? YES ☑ NO ☐ | TRIAL ATTORNEY? YES ☐ NO ☐ |
| DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☑ | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
### Eastern Division

JUDGE HIBBLER

MAGISTRATE JUDGE NOLAN

In the Matter of

DAVE DIPAOLA,

v.

UNIVERSAL ACCESS, INC., et al.

DOCKETED

MAY 1 5 2002

Case Number: **02C 3470**

FILED-ED4
02 MAY 14 PM 4:18
U.S. DISTRICT COURT CLERK

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR

Dave DiPaola, individually and on behalf of all others similarly situated,

| (E) | (F) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME Matthew E. Van Tine | NAME Paul J. Geller |
| FIRM Same as (B) | FIRM Cauley Geller Bowman & Coates, LLP |
| STREET ADDRESS | STREET ADDRESS 2266 Glades Road, Suite 421A |
| CITY/STATE/ZIP | CITY/STATE/ZIP Boca Raton, Florida 33431 |
| TELEPHONE NUMBER | TELEPHONE NUMBER (561) 750-3000 |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6186180 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR? YES [✓] NO [ ] | MEMBER OF TRIAL BAR? YES [ ] NO [✓] |
| TRIAL ATTORNEY? YES [✓] NO [ ] | TRIAL ATTORNEY? YES [✓] NO [ ] |
| | DESIGNATED AS LOCAL COUNSEL? YES [ ] NO [✓] |

| (G) | (H) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME Nadeen Faruqi | NAME |
| FIRM Faruqi & Faruqi LLP | FIRM |
| STREET ADDRESS 320 East 39th Street | STREET ADDRESS |
| CITY/STATE/ZIP New York, New York 10016 | CITY/STATE/ZIP |
| TELEPHONE NUMBER (212) 983-9330 | TELEPHONE NUMBER |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR? YES [ ] NO [✓] | MEMBER OF TRIAL BAR? YES [ ] NO [ ] |
| TRIAL ATTORNEY? YES [✓] NO [ ] | TRIAL ATTORNEY? YES [ ] NO [ ] |
| DESIGNATED AS LOCAL COUNSEL? YES [ ] NO [✓] | DESIGNATED AS LOCAL COUNSEL? YES [ ] NO [ ] |